■ AMERICAN PREFERRED PRESCRIPTION, INC., Respondent, v HEALTH MANAGEMENT, INC., et al., Appellants, et al., Defendants. (And a Third-Party Action.) [678 NYS2d 1] —Order, Supreme Court, New York County (Lorraine Miller, J.), entered on or about September 26, 1996, which, *inter alia*, granted plaintiff's motion for leave to amend its complaint and denied the motion of defendant Preferred RX, Inc. (RX) for summary

judgment dismissing the complaint, without prejudice to renewal within 60 days of the filing of a note of issue by plaintiff, unanimously modified, on the law, plaintiff's motion for leave to amend its complaint denied insofar as it seeks to add a fifth cause of action and the motion of defendant Preferred RX, Inc. for summary judgment dismissing the complaint as to it granted and, as so modified, the order is otherwise affirmed, with one bill of costs payable to defendants-appellants. The Clerk is directed to enter judgment in favor of defendant-appellant Preferred RX, Inc. dismissing the complaint as against it.

Plaintiff and RX are competitors in the mail-order pharmacy business. In January 1993, RX obtained a $2.2 million judgment (later reversed on appeal) against plaintiff, one of its principals and two affiliated companies as a result of which plaintiff filed for Chapter 11 bankruptcy.

The original verified complaint in this action alleges four causes of action: tortious interference with existing contractual relationships; tortious interference with prospective contractual relationships; false descriptions in consumer advertising or promotion in violation of the Lanham Act (15 USC § 1125); and defamation. All of the claims are based on plaintiff's allegations that RX, as a creditor in the bankruptcy proceeding, was able to obtain confidential information about plaintiff's operation and plans, which it then shared with the other defendants to utilize in a common scheme to destroy plaintiff's business, including allegations that defendants told plaintiff's existing and potential customers and business associates that plaintiff and its principals engaged in fraudulent and illegal activities.

The fifth cause of action sought to be asserted against defendants Cost Controls, Inc., Preferred RX, Inc., Health Management, Inc., and the so-called "Ehrler defendants" alleges that, in filing a reorganization plan that was inherently unworkable and in falsely representing to the Bankruptcy Court that Health Management was capable of managing the reorganized debtor, plaintiff herein, those defendants worked a fraud on the Bankruptcy Court that was intentionally designed to delay and impede the bankruptcy process so as to keep plaintiff in bankruptcy as long as possible and to cause it to incur additional and unnecessary attorneys' fees. It further alleges that the Ehrler defendants were allegedly induced to participate in this scheme by the promise that they would receive full payment of their claims and that they participated in the scheme by stealing confidential proprietary information from plaintiff and providing it to Preferred RX, Cost Controls and their attorneys.

As a creditor of plaintiff, RX was entitled to file a reorganization plan (11 USC § 1121 [c]) and, to the extent plaintiff contends that the plan lacked merit or was otherwise vexatious, the proper recourse was to apply for sanctions or other relief to the Bankruptcy Court, which itself noted that if plaintiff's claim really were for abuse of the bankruptcy process, it would be a matter for that court to decide. Plaintiff does not refute RX's contention that plaintiff did not file a valid reorganization plan until May 1996, eight months after Cost Controls had filed its own plan, or that other third parties also submitted reorganization plans, or even that plaintiff had caused most of the delays. It is thus unclear how Cost Control's plan hindered or prolonged the bankruptcy proceeding.

If the fifth cause of action were interpreted to allege a prima facie tort, of which abuse of process is a type (*Curiano v Suozzi*, 102 AD2d 759, *affd* 63 NY2d 113), plaintiff still fails to state a cause of action inasmuch as it fails to allege that defendants' intent to harm plaintiff was their sole motive (*Smukler v 12 Lofts Realty*, 156 AD2d 161, 163, *lv denied* 76 NY2d 701; *WFB Telecommunications v NYNEX Corp.*, 188 AD2d 257, 258, *lv denied* 81 NY2d 709). Plaintiff, in its complaints, as originally pleaded and as amended, admits that defendants, at least in part, desired to destroy plaintiff's business in order to eliminate it as a competitor (either by wiping it out or taking it over) and thus advance their own financial interests.

In its brief, plaintiff denominates the fifth cause of action as a "conspiracy to interfere with contractual and pre-contractual relations and to destroy a business by the use of unlawful means or by the improper use of lawful means". While there is no cognizable action for a civil conspiracy, a plaintiff may plead conspiracy in order to connect the actions of the individual defendants with an actionable underlying tort and establish that those acts flow from a common scheme or plan (*Smukler v 12 Lofts Realty, supra*). However, plaintiff has failed to sufficiently allege an actionable underlying tort and thus there is no support for the conspiracy allegations. The original and amended complaints, as well as Eleanor Adiel's affidavits, reveal that all the identified contracts that defendants allegedly interfered with (and which are the predicates of the remaining causes of action) were entered into prior to September 1995, when the reorganization plan was filed. Plaintiff has failed to allege an actual breach of a contract or any specific business relationships that it was prevented from entering into by the purported tortious interference. Plaintiff only states that defendants acted "to disrupt the business of [plaintiff]".

Furthermore, plaintiff has not pleaded facts such as would indicate that it suffered any damages from the alleged tortious interference (*NRT Metals v Laribee Wire,* 102 AD2d 705, 706, *appeal dismissed* 63 NY2d 770). The only damages pleaded are "additional and unnecessary attorneys *[sic]* fees" incurred in litigating the reorganization plan, which are thus unrelated to any tortious interference with economic relations.

As to the allegations about the Ehrler defendants, RX states that plaintiff has settled all its claims against the Ehrler defendants in Bankruptcy Court pursuant to a general release. Having settled those claims and executed a general release, plaintiff is precluded from asserting them in this action.

RX's motion for summary judgment dismissing the amended complaint should also have been granted. Although the IAS Court denied the motion solely on the ground that additional discovery should be had, the court itself noted the extensive discovery that had been undertaken in Federal court and plaintiff met the motion on the merits and does not argue on appeal that any further discovery is needed.

In its first cause of action, plaintiff asserts that defendants tortiously interfered with its existing contracts by disseminating false and misleading information about plaintiff to its "customers, business associates and potential customers and business associates".

A claim of tortious interference with contract requires: (1) the existence of a valid contract between plaintiff and a third party, (2) defendant's knowledge of the contract, (3) defendant's intentional procurement of a breach of the contract without justification, (4) actual breach of the contract, and (5) resulting damages. (*Lama Holding Co. v Smith Barney,* 88 NY2d 413, 424, *affg* 215 AD2d 314.)

However, the only existing contracts even mentioned in plaintiff's complaint were its oral agreements with three individuals: Michael Kaminer and Susan and Charles Hutson, pursuant to which the Hutsons were to perform marketing services on behalf of plaintiff for an indefinite term, for which they would receive certain commissions. As such, the agreements were terminable at will, by either party, as was the agreement with Michael Kaminer, a public relations consultant retained by plaintiff. Agreements that are terminable at will are classified as only prospective contractual relations, and thus cannot support a claim for tortious interference with existing contracts (*Guard-Life Corp. v Parker Hardware Mfg. Corp.,* 50 NY2d 183, 191-192). Even if there were existing contracts with the Hutsons and Kaminer, plaintiff has not established

all of the elements necessary to support a claim for tortious interference therewith.

Having failed to demonstrate that the agreements with the Hutsons and Kaminer would have continued "but for" defendants' actions, or to sufficiently support a claim for damages, the cause of action would also fail under the theory of tortious interference with prospective business relations (*Bankers Trust Co. v Bernstein*, 169 AD2d 400, 401).

Furthermore, plaintiff's claim, in its brief, which is not otherwise pleaded in either the complaint or the amended complaint, that defendants also tortiously interfered with its loan agreement with Hadiya Holdings, Inc., its exclusive lender, which allegedly divested itself of its loan and withdrew its bankruptcy reorganization plan, which was more favorable than the one ultimately approved, is unsupported by any facts from anyone with personal knowledge or documentary evidence. Eleanor Adiel's uncorroborated recitations of the events do not even reveal how she came about the information other than the statement "plaintiff learned of" the facts. Thus, plaintiff has not shown that defendants procured a breach of any agreement with Hadiya.

In its second cause of action, plaintiff asserts that defendants tortiously interfered with its prospective business relations. In addition to establishing the element that defendants acted solely out of malice or employed "wrongful means," plaintiff must also demonstrate that a contract would have been entered into "but for" defendants' conduct (*supra,* at 401). " 'Wrongful means' " include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure" (*Guard-Life Corp. v Parker Hardware Mfg. Corp., supra,* 50 NY2d, at 191).

Other than the agreements with the Hutsons and Kaminer, plaintiff identifies two sets of prospective economic relations defendants allegedly interfered with: various hospitals that the Hutsons solicited and attendees of the Gay & Lesbian Business Exposition held on April 16, 1994, where the Adiels were operating a booth pursuant to their award of the exclusive right to promote pharmaceutical services.

Eleanor Adiel asserts in her affidavits that the Hutsons "reported to us [plaintiff] that they were encountering situations in which hospitals and other medical personnel were advising them that they had heard that [plaintiff] and its principals had been indicted or convicted of Medicaid and Medicare Fraud". Only two specific instances were cited: a "Hospital administrator" from Bowman-Baptist Gray Hospital

and an unidentified "conference" in Washington, D.C. The excerpts from Hutson's deposition, upon which Eleanor Adiel's affidavit is based, do not provide any more details. The only instances where Eleanor Adiel purports to have personal knowledge are supported by the mere statement: "my staff and I encountered similar situations at St. Francis Hospital in Wichita Kansas, Fairfax Hospital in Falls Church, Virginia and Carillon Hospital in Roanoke, Virginia". Those sketchy factual assertions do not demonstrate that plaintiff would have entered into any type of contractual relation with the hospitals "but for" defendants' conduct, and the claim for tortious interference with those relationships should be dismissed (*Bankers Trust Co. v Bernstein, supra,* 169 AD2d at 401; *see also, Lama Holding Co. v Smith Barney,* 88 NY2d 413, 424, *supra*). In fact, there is no indication anywhere in the record as to whether or not any contract was entered into or rejected.

With regard to the business exposition, plaintiff asserts that Sean Strub, a principal of defendant Community Prescription Services, which contracts with RX for services, loudly announced that the Adiels were murderers and criminals, morally and financially bankrupt, and could not provide good services to clients, thereby driving away many prospective customers. Plaintiff need not identify the customers by name, contrary to the assertion of RX. Nevertheless, plaintiff has failed to support its claim of $10 million in damages resulting from the misrepresentations. There is no basis in the record upon which to find that that amount, or any amount, of damages was actually sustained, and Eleanor Adiel herself admitted during her deposition that she had no idea as to how the $10 million figure was calculated, other than to state that Terry Kaliner, plaintiff's financial officer, "suggest[ed]" or "estimated" that amount. Plaintiff attempts to shift the burden to defendants, arguing that they should have deposed the financial officer; however, it was plaintiff's burden to come forward with some evidence of damages, such as an affidavit by the financial officer discussing the basis for his estimate or a comparison of sales derived from different expositions. Since plaintiff's claim for damages is entirely speculative, the cause of action for tortious interference with prospective business relations should be dismissed (*Lama Holding Co. v Smith Barney, supra,* 215 AD2d, at 315).

As to its third cause of action, plaintiff asserts a violation of the Lanham Act (15 USC § 1125), which provides, in pertinent part:

"(a) * * * (1) Any person who, on or in connection with any

goods or services * * * uses in commerce any * * * false or misleading description of fact, or false or misleading representation of fact, which * * *

"(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

"shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

In order to establish a claim under 15 USC § 1125, a plaintiff must show that (1) the defendant made a false or misleading representation regarding the nature, characteristics or quality of the plaintiff's services; (2) the representations were used " 'in commerce' "; (3) the representations were made in the context of commercial advertising or promotion; and, (4) the defendant's actions made the plaintiff believe it would be damaged by the representations (*Towers Fin. Corp. v Dun & Bradstreet*, 803 F Supp 820, 823).

Having failed to demonstrate its damages, an essential element of the Lanham Act, the third cause of action should be dismissed (*Construction Technology v Lockformer Co.*, 704 F Supp 1212, 1221; *American Brands v R.J. Reynolds Tobacco Co.*, 413 F Supp 1352, 1360).

Finally, plaintiff asserts a claim for slander as its fourth cause of action, which is based on the same set of facts underlying the Lanham Act claim. Most of the alleged defamatory statements upon which plaintiff grounds its claim are not set forth in the complaint *in haec verba*, as required by CPLR 3016 (a) (*Le Sannom Bldg. Corp. v Dudek*, 177 AD2d 390, 391), but are merely paraphrased. As drafted, the complaint thus reveals that plaintiff was merely paraphrasing the statements, notwithstanding the quotations marks around the word "murderers", and the claim, insofar as based on the above-mentioned comments, should therefore be dismissed (*supra*).

Plaintiff does quote two comments. First, the amended complaint alleges that Robert Clifton, an officer of defendant Health Management, Inc., allegedly told the Hutsons that they were " 'dealing with someone who has been involved in a series of illegal activities for over twenty years' ". Second, the amended complaint quotes a letter from a certain Ellen Woodell, stating that another Health Management employee had told her plaintiff was " 'somehow connected with "The Mob" ' " and "that 'there is a problem with shady dealings in the management of the Company' ". However, nowhere in the complaint, amended complaint, or the record, does plaintiff contest

the veracity of the statements' contents, a necessary element of slander (*Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 379-380, *cert denied* 434 US 969; *Christopher Lisa Matthew Policano, Inc. v North Am. Precis Syndicate,* 129 AD2d 488, 489). By plaintiff's, and the complaint's, own suggestion, the statements are derived from a "Business Week" article that discussed the Adiels' association with Harold Derber, a drug dealer/money launderer/illegal campaign donor who was apparently murdered in Miami, and which also indicated that the Adiels' own financial dealings were being investigated by a Congressional subcommittee. Plaintiff's only commentary, in a footnote of Eleanor Adiel's affidavit, is that "the article was incorrect, since [Derber] was not a convicted drug dealer". Since plaintiff did not establish, or even plead, that the alleged statements were false, such claim should have been dismissed. Concur—Rosenberger, J. P., Nardelli, Williams and Andrias, JJ.